I concur with that portion of the majority opinion that affirms as to the wantonness claims. As to the holdings on the other claims, I dissent. Mrs. Halsey did not present substantial evidence to support her claims alleging negligent design/manufacture and failure to warn.
 Facts and Testimony
The defendant A.B. Chance Company presented the testimony of several Alabama Power Company employees who were familiar with the proper use of this platform. David Dahlke, who was responsible for training linemen such as Mr. Halsey, stated that the proper method for extending the chain on a "hot line tool" would be to use the extension chain supplied by Chance. He stated that he deals with OSHA requirements and that a designed system such as the Chance platform must be used with the manufacturer's recommended devices. When asked if the padlock/keeper pin method Mr. Halsey used to extend the chain was a proper way to extend it, Dahlke responded: "Not only no, but hell no." (C.R. 126-30.)
Chance sold extension chains for the very purpose for which Mr. Halsey used the keeper pin. Alabama Power had on hand between 50 and 100 extension chains made by various manufacturers; sixteen of them had been purchased from Chance. It was undisputed that these chains would have safely extended the chain of the platform from which Mr. Halsey fell. The keeper pin is clearly not a link in the chain. The keeper pin is not welded closed but has an open-ended eye connecting it to the chain. A chain link has no open end that a heavy weight, like the platform in this case, could pull open. On the day of Mr. Halsey's fall, Mickey Flowers, the crew leader, had offered to demonstrate for Mr. Halsey the proper use of the platform. Mr. Halsey refused, saying he had previously hung such platforms. When the chain Mr. Halsey was using could not reach around the pole, Flowers sent two lengths of chain and two Alabama *Page 612 
Power "X" padlocks up to Halsey.[2] Flowers did not give Mr. Halsey the authorized extension chains provided by Chance to Alabama Power. Chance also did not design, manufacture, or sell the padlocks given to Halsey. Instead of placing the padlocks into two links in the chains on the platform, Halsey placed the padlocks through the eyes of the keeper pins. Doyle Darby, a supervisor who was involved with Alabama Power's post-accident investigation, said that Mr. Halsey could have attached the padlocks to the last link of each chain where the keeper pins were attached, instead of to the keeper pins themselves. (C.R. 278-79.)
According to one of Mrs. Halsey's experts, Dr. Paul Packman, the platform and pivot attachment fell from the pole because the padlocks pulled through the keeper pins, disconnecting the chains from the pole and allowing the platform and Mr. Halsey to fall. Dr. Packman said that the "accident probably would not have taken place if [Mr. Halsey] had not used the keeper pin as part of the connector." (C.R. 181.)
Mr. Halsey's coworkers also testified. J.R. Walton testified that, based on the knowledge he had before the accident, he would not put a padlock into the keeper pin to extend a chain while on one of these platforms. He stated: "First thing, it's not a proper way to put a board up. That keeper pin, in looking at it, from my mind, would not hold the kind of weight you are looking at there. . . . It's not a solid link." (C.R. 194.) He said a person could know that from simply looking at it.
Mickey Flowers, the crew leader, testified similarly about not putting a padlock through a keeper pin: "It's open on one end. . . . It could come out." (C.R. 108-09) He said he knew that not because he had to be warned but because of "common sense." Hubert McBrayer stated that there was "no way" he would place a padlock in the eye of a keeper pin to extend a platform chain because he could tell from looking at the pin that it was too weak to hold. Five other coworkers agreed that it was obvious that a keeper pin could not hold the weight if it was being used to extend a platform chain, as Mr. Halsey was using the keeper pin in this case. A supervisor, Doyle Darby, testified that he could tell the keeper pin was insecure as a load-bearing device. Mr. Robert Homan, the general foreman at the project Mr. Halsey was working on, testified as to why the keeper pin was not adequate: "It had a point of separation. . . . [Ilt had a gap in it." (C.R. 165.)
Dr. Packman explained that the only purpose of the keeper pin was its use as a safety device. Its purpose is to secure the chain in a slot on the pole; it keeps the chain from disengaging completely if the chain comes loose from the slot holding it on the pole. He also stated that Halsey misused the keeper pin.
The only evidence the majority relies upon to reverse the judgment of the trial court is the testimony of Mrs. Halsey's expert Dr. Edward Karnes. He gave his opinion of how he thought a layperson would have acted in the situation in which Mr. Halsey found himself. He stated:
 "Q. And what about you as a layperson just looking at this device and that keeper pin, if you were going to get on a pole and hook that thing up, would you put a padlock through that?
"A. I think I would. . . .
 "I think I would reasonably assume, again, based on the kind of expertise that I have, that the pin would have the same strength characteristics as the chain, because it's attached to the chain."
(C.R. 236.) He stated that "the foreseeability of a user splicing the chain is a given from A.B. Chance's perspective." The defendant presented the deposition testimony of several laypersons.
Karnes went on to address the issue of warning:
 "My second opinion is that A.B. Chance again did not exercise reasonable, appropriate care by failing to provide an on-product warning on the platform that *Page 613 
would be available to persons who would be specifically at risk in using the platform.
". . . .
 "And there are various alternatives that I've identified from my review of materials, such as perhaps painting it red, the safety pin, or not making it an integral part of the chain, attaching it by a wire or something like that."
(C.R. 306-08.)
 Analysis
The testimony of those who used these platforms and chains on a regular basis was uniform, and they were adamant in saying that the danger of using the keeper pin in the way Mr. Halsey used it was open and obvious. The trial judge was able to examine the physical evidence. Chance's appellate brief included a color photograph of the keeper pin. Mrs. Halsey's expert even admitted that Mr. Halsey misused the keeper pin. The "layperson" testimony of Mrs. Halsey's expert, Dr. Karnes, is not substantial evidence that should overcome Chance's properly supported summary judgment motion. There is no issue for the jury, because the testimony was undisputed that Mr. Halsey misused the product. The only question was whether it was reasonably foreseeable that a user would misuse the product in this way. The platform that fell was 18 years old. In all the time Chance had manufactured these platforms, there had never before been an accident in which someone had used the keeper pin as a load-bearing device. When I compare it to the evidence presented by Chance, I do not consider substantial the "layperson" testimony of a plaintiffs expert as to the similarity between the color of the keeper pin and the color of the chain.
Some might argue that the opinion of an "expert" should outweigh the opinions of several users of a product. Not necessarily so. Trial courts must carefully scrutinize the opinions of so-called experts to ensure that a jury does not hear what has in recent years come to be known as "junk science." It is that very presumption — that "experts" know better than the average person — that makes "junk science" so dangerous. Peter W. Huber's book Galileo's Revenge: JunkScience in the Courtroom (1991), at pp. 2-3, gives an apt description of the junk science phenomenon:
 "Junk science cuts across chemistry and pharmacology, medicine and engineering. It is a hodgepodge of biased data, spurious inference, and logical legerdemain, patched together by researchers whose enthusiasm for discovery and diagnosis far outstrips their skill. It is a catalog of every conceivable kind of error: data dredging, wishful thinking, truculent dogmatism, and, now and again, outright fraud."
The majority has based its reversal of this trial judge's summary judgment decision solely on one "expert" opinion. That opinion was applied to a question of common sense and experience as to the proper use of the platform involved in this case. It was an opinion that should hold no more weight than the testimony of the men who used that platform. The trial judge, who examined the keeper pin, apparently thought it was worthy of less weight. This Court should not substitute its judgment of the value of that opinion for that of the trial judge.
The plaintiff's expert says that Chance not only should have foreseen this obviously dangerous use, but also should have provided an on-product warning of some kind to prevent the kind of misuse Mr. Halsey made of the keeper pin. The number of misuses of any one product is perhaps infinite. A product that can perhaps be misused in the greatest variety of ways is the match. It can light a fire for grilling steaks, or it can light a bomb for demolishing a building and destroying hundreds of lives. Yet, so far as I know, no court ever has required — and I hope never will require — a match manufacturer to place an on-product warning as to all the foreseeable misuses of a match. There is a limit as to what a manufacturer should be expected to warn users of, particularly when the warning applies to an obvious misuse of the product. In this case, the evidence is clear that using the keeper pin as a weight-bearing device was openly and obviously dangerous. The following questions come to mind: How could painting the keeper pin red have kept Mr. Halsey from misusing it? The platform was 18 years old. I do not know the age of *Page 614 
the extension chains. Would the red paint on a chain and keeper pin not wear off with several years of use? Would attaching the keeper pin by a wire not create another danger — that of losing the keeper pin if the wire broke over time? Would on-product writing not wear out over time? Must a manufacturer warn an intended user of every conceivable dangerous misuse one might make of that manufacturer's product, no matter how obvious the danger is? I do not think so.
For these reasons, I must respectfully dissent from that portion of the opinion that reverses the summary judgment in favor of the defendant as to the claims alleging negligent design/manufacture and failure to warn.
[2] Although the padlocks were not an acceptable device for extending the chains, the evidence was undisputed that the cause of the fall was the keeper pin and not the padlocks used by Alabama Power.